IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

LARRY VINCENT,

    Plaintiff

vs.

CITY OF TALLADEGA, ALABAMA, ET AL.,

    Defendants

CIVIL ACTION NO.

96-AR-1828-E

**ENTERED**

SEP 2 3 1997

### MEMORANDUM OPINION

The court has before it simultaneously filed counter-motions for summary judgment. The fact that both plaintiff and defendants claim that there are no disputes of material fact does not necessarily lead to the conclusion that one motion must be granted and the other denied. However, the existence of such a consensus, considered with the briefs and evidentiary materials submitted by the parties, strongly indicates to the court that the case is ripe for summary disposition. Of course, if plaintiff's motion were granted, the judgment would be partial, only establishing liability, and the amount of damages would remain for determination at trial.

### The Procedural Posture and the Issues Presented

Larry D. Vincent ("Vincent"), a firefighter for defendant, City of Talladega ("City"), invokes 42 U.S.C. § 1983, suing the City; the City Council ("Council"); its five members ("Patterson," "Ford," "Armstrong," "Tucker," "Hill"), only in their official

1

capacities; Mayor Charles Osborne ("Mayor"), both individually and in his official capacity; Fire Chief Roy Johnson ("Chief"), both individually and in his official capacity; and Fire Captain Kenneth L. Dickinson ("Captain"), both individually and in his official capacity. Vincent complains in considerable detail about alleged mistreatment, eventuating in a suspension without pay by the Chief. The Civil Service Board of City of Talladega (("Personnel Board") later reversed the suspension on appeal. Understandably, the Personnel Board, and its members, are not made defendants by Vincent. The Chief ordered the suspension after a confrontation and disagreement between Vincent and the Captain about what was the appropriate response to a particular fire emergency.

Vincent claims that under color of law defendants denied him "freedom of speech" in violation of the First Amendment; took his property right to his job without "due process" in violation of the Fourteenth Amendment; and denied him "equal protection" in violation of the Fourteenth Amendment.

### Pertinent Undisputed Facts

There is no real dispute over the facts that bear on the outcome of this controversy. To the extent that there are any differences between the parties over what constitute the pertinent facts, the court will assume for the purposes of this opinion that plaintiff's version of the facts is correct. There is no need to state the facts in the minute detail contained in the voluminous evidentiary materials submitted. It is sufficient for the purposes

2

of disposition to state the pertinent facts in bare outline and distilled to their essence. They are as follows:

1. Vincent and the Captain got into a shouting match over what was the correct response to an emergency situation. At the time, both were employees of the Fire Department. The Captain was Vincent's superior officer.

2. Without convening any sort of formal review board, and without precisely following all the written procedures provided by the City's policy manuals as a precondition to the administering of discipline in the form of a suspension, the Chief suspended Vincent without pay.

3. The Council previously had established procedures which are not here alleged to be either facially or intrinsically deficient or inadequate to provide procedural "due process." The Council did nothing affirmatively to protect or to assure Vincent's (1) alleged right to exercise his alleged First Amendment right to express himself, (2) his alleged right to "due process," or (3) his right to "equal protection." The Council simply awaited the outcome of the Personnel Board review.

4. After being suspended, Vincent appealed to the Personnel Board, which, after a formal hearing, ordered his suspension vacated and his pay restored.

5. As previously stated, the City had no formal policy or proven custom and practice of denying its employees "due process," either procedural or substantive, and/or of depriving them of their

3

freedom of legitimate speech on matters of general public concern, and/or of denying them the equal protection of the law. In fact, the City quite obviously had created its Personnel Board for the very purpose of providing a mechanism for affording employees "due process." Vincent availed himself of that review opportunity, and he not only obtained a review but succeeded in overturning his suspension, proving that the Personnel Board was not a "rubber stamp" for the City. Although the City took its time in refunding Vincent's back pay, it did not refuse to honor the Personnel Board's decision.

6.   Arguably and probably the City had delegated the decision making authority regarding the administration of discipline within the Fire Department to the Chief, including administering the "due process" rules as he deemed appropriate, that is, until an appeal to the Personnel Board.

### Conclusions of Law

This case was filed long before the Eleventh Circuit decided *Scala v. City of Winter Park*, 116 F.3d 1396 (11th Cir. 1997). Neither side of the controversy has mentioned *Scala*, probably being unaware of its implications for this case. The court finds *Scala* controlling.

It would be relatively easy for the court to demonstrate that each and all of the defendants who are sued in their individual capacities enjoy qualified immunity as individuals in that they did nothing objectively unreasonable and nothing that a reasonable

4

person in their respective official positions would have any reason to think constituted an unconstitutional act, vis-a-vis Vincent. The adoption of rules by the Council was, of course, a legislative act that would provide them additional insulation if it were plaintiff's enigmatic intention to complain about the adequacy of the rules intrinsically. The court does not detect such a contention by Vincent. Perhaps the qualified immunity defense should have been acknowledged and used by the court when the defendants who could avail themselves of that defense filed their Rule 12(b)(6) motions, thus sparing them, as well as plaintiff, the time, money and energy that they have expended since the 12(b)(6) motions were overruled.

Secondly, it would have been relatively easy to demonstrate that the "speech" that Vincent wants protected is not of the kind that enjoys First Amendment protection. While it is undoubtedly true that the general public has an interest in having quality fire protection, it is also true that the general public has an interest, at least theoretically, in good government in all of its aspects, and an internal controversy over firefighting policy and procedures within a fire department cannot be protected speech any more than a surly, insubordinate remark by a police chief to a mayor can receive First Amendment protection.

Thirdly, it would be relatively easy to demonstrate that Vincent did receive <u>procedural</u> due process, even if that process was not in perfect accord with the City's rules and policies. The

5

Fourteenth Amendment, and the Supreme Court's gloss on it, is the measure of procedural due process, not the particular procedural rules of a particular governmental entity. Furthermore, it is difficult to tell whether Vincent is complaining of a violation of his right to <u>procedural</u> due process or of a violation of his right to <u>substantive</u> due process, or both. While these are distinct concepts, they can, and do, overlap on occasion. This court well remembers *Greenbrier, Ltd. v. City of Alabaster*, 881 F.3d 187 (11th Cir. 1989), wherein the City of Alabaster violated most, if not all, of its own procedural rules as well as the State of Alabama's procedural rules applicable to municipalities. Nevertheless, the Eleventh Circuit held that the City's action did not violate <u>substantive</u> due process because this trial court should have recognized, as a matter of law (a matter for the court), that nothing the Mayor or Council did, vis-a-vis Greenbrier, was "arbitrary" or "capricious," because what they did had a "rational" basis. The Eleventh Circuit made it plain that it is always the trial court's responsibility to determine whether <u>substantive</u> due process has been afforded. In other words, courts supposedly are equipped to recognize "arbitrariness" and "capriciousness" when they see it and, therefore, don't need juries to decide such matters. In the instant case, although the Personnel Board disagreed with the Chief, the Chief had what this court finds clearly to have been a rational basis for the disciplinary action he took against Vincent. Vincent does not claim that the Chief was

6

motivated by race, sex, national original or religion--the kinds of motivations that require plumbing the human mind, a function juries routinely perform. Vincent claims that the motivation was a desire to retaliate against him for speaking his mind. Even if the Chief <u>was</u> the City (its final decisionmaker under *Pembaur* and *Praprotnik*), his action nevertheless did not fall short on the <u>substantive</u> due process scale. To hold otherwise in this case would be an invitation for every municipal employee who feels mistreated because he or she has complained about work conditions or departmental decisions to invoke § 1983 and to sue the boss.

Finally, this court simply fails to comprehend Vincent's "equal protection" claim, which finds no support in the evidence.

### The Impact of *Scala*

In *Wilson v. Taylor*, 733 F.2d 1539, 1541 (11th Cir. 1984), thirteen years before *Scala*, the Eleventh Circuit said:

> The jury, in special interrogatories, concluded that (1) Wilson had been discharged by Chief Beary due to his relationship with Susan Blackburn, (2) Chief Beary was delegated the final or ultimate authority to discharge Wilson and to decide why he should be discharged, and (3) <u>Chief Beary had been delegated the final or ultimate authority concerning any due process procedures to be accorded to Wilson</u>.

(emphasis supplied). This statement was written with *Monell*, as modified by *Pembaur* and *Praprotnik*, in mind. Then appeared *Scala*, which wiped *Wilson v. Taylor* off the books. *Scala* fits Vincent's case like a glove, and will therefore be quoted at length. It follows:

> In *Monell v. Department of Social Services*, 436 U.S. 658, 98

7

S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court held that municipalities may not be held liable under 42 U.S.C. § 1983 on a theory of respondeat superior. Instead, municipalities may only be held liable for the execution of a governmental policy or custom. As the *Monell* Court explained:

> [I]t is when execution of a government's policy or custom, whether made by its lawmakers or by *those whose edicts or acts may fairly be said to represent official policy*, inflicts the injury that the government as an entity is responsible under § 1983. *Id.* at 694, 98 S.Ct. at 2037-38 (emphasis added).

Later, in *Pembaur v. City of Cincinnati*, 475 U.S.469, 106 S.Ct. 1292, 89 L.Ed.2d 452(1986), the Supreme Court clarified Monell's "policy or custom" requirement. In *Pembaur*, the Court explained that "municipal liability may be imposed for a single decision by municipal *policymakers* under appropriate circumstances." *Id.* at 480, 106 S.Ct. at 1298 (majority opinion) (emphasis added). In particular, "where action is *directed by those who establish governmental policy*, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly." *Id.* at 481, 106 S.Ct. at 1299 (majority opinion) (emphasis added). Thus, liability may arise from "a course of action tailored to a particular situation and not intended to control decisions in later situations," id. at 481, 106 S.Ct. at 1299 (majority opinion), provided that "the decisionmaker possesses *final authority* to establish municipal policy with respect to the action ordered," id. at 481, 106 S.Ct. at 1299 (plurality opinion) (emphasis added) (footnote omitted).[2]

In light of *Pembaur*, this Court has interpreted Monell's policy or custom requirement to preclude § 1983 municipal liability for a subordinate official's decisions when the final policymaker delegates decisionmaking discretion to the subordinate, but retains the power to review the exercise of that discretion:

> [T]he mere delegation of authority to a subordinate to exercise discretion is not sufficient to give the subordinate policymaking authority. *Rather, the delegation must be such that the subordinate's discretionary decisions* are not constrained by official policies and are not subject to review.

*Mandel v. Doe*, 888 F.2d 783, 792 (11th Cir.1989) (emphasis added) (citations omitted). That interpretation is based on the Supreme Court's decision in *City of St. Louis v. Praprotnik*, 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) (plurality opinion). Although *Praprotnik* was a plurality opinion, the decision merits discussion

8

in further detail, because our circuit's law in the area has been molded around that decision's reasoning and because the facts of *Praprotnik* are closely analogous to those of this case.

In *Praprotnik*, a municipal employee of that name was transferred and subsequently was laid off from his job with the City of St. Louis, Missouri. *See Id.* at 114-16, 108 S.Ct. at 920. The municipal officials who were responsible for initiating the transfer and layoff, respectively, were: (1) Frank Hamsher, the Director of the St. Louis Community Development Agency; and (2) Robert Killen, the Director of Heritage. *See Id.* at 115-16, 108 S.Ct. at 920. Praprotnik sued the City of St. Louis, alleging that he had been penalized for exercising his First Amendment rights, i.e., that the transfer and layoff were in retaliation for his earlier exercise of his right to appeal a disciplinary suspension to the St. Louis Civil Service Commission. *See Id.* Before filing suit, Praprotnik appealed the layoff decision to the Commission, but those proceedings were suspended when Praprotnik filed his federal lawsuit. *See Id.*

The district court entered judgment on a jury verdict for Praprotnik, and the Eighth Circuit affirmed in part. *See Id.* at 117, 108 S.Ct. at 920. In doing so, the Eighth Circuit reasoned that Hamsher and Killen were municipal policymakers who could subject the city to § 1983 liability for their employment decisions--even though those decisions were reviewable by the Civil Service Commission. *See Id.* at 117-18, 108 S.Ct. at 921. The Supreme Court reversed, and its explanation for that decision is so directly on point that we think it worthwhile to reproduce a considerable part of it:

> The Court of Appeals concluded that "appointing authorities," like Hamsher and Killen, who had the authority to initiate transfers and layoffs, were municipal "policymakers." The court based this conclusion on its findings (1) that the decisions of these employees were not individually reviewed for "substantive propriety" by higher supervisory officials; and (2) that the Civil Service Commission decided appeals from such decisions, if at all, in a circumscribed manner that gave substantial deference to the original decisionmaker. 798 F.2d at 1174-1175. We find these propositions insufficient to support the conclusion that Hamsher and Killen were authorized to establish employment policy for the city with respect to transfers and layoffs.

*Id.* at 129, 108 S.Ct. at 927. After quoting the St. Louis City Charter to establish that the Civil Service Commission had the final authority over transfers and layoffs, the Supreme Court continued:

9

> This case therefore resembles the hypothetical example in *Pembaur*: "[I]f [city] employment policy was set by the [Mayor and Aldermen and by the Civil Service Commission], only [those] bod[ies'] decisions would provide a basis for [city] liability. This would be true even if the [Mayor and Aldermen and the Commission] left the [appointing authorities] discretion to hire and fire employees and [they] exercised that discretion in an unconstitutional manner...." 475 U.S. at 483, n. 12, 106 S.Ct. at 1300, n. 12. A majority of the Court of Appeals panel determined that the Civil Service Commission's review of individual employment actions gave too much deference to the decisions of appointing authorities like Hamsher and Killen. Simply going along with discretionary decisions made by one's subordinates, however, is not a delegation to them of the authority to make policy. It is equally consistent with a presumption that the subordinates are faithfully attempting to comply with the policies that are supposed to guide them. It would be a different matter if a particular decision by a subordinate was cast in the form of a policy statement and expressly approved by the supervising policymaker. It would also be a different matter if a series of decisions by a subordinate official manifested a "custom or usage" of which the supervisor must have been aware. *See supra*, at 926. In both those cases, the supervisor could realistically be deemed to have adopted a policy that happened to have been formulated or initiated by a lower-ranking official. But the mere failure to investigate the basis of a subordinate's discretionary decisions does not amount to a delegation of policymaking authority, especially where (as here) the wrongfulness of the subordinate's decision arises from a retaliatory motive or other unstated rationale. In such circumstances, the purposes of § 1983 would not be served by treating a subordinate employee's decision as if it were a reflection of municipal policy.

*Praprotnik*, 485 U.S. at 129-30, 108 S.Ct. at 927-28 (alterations in original).

This Court's post-*Praprotnik* decisions have consistently recognized and given effect to the principle that a municipal official does not have final policymaking authority over a particular subject matter when that official's decisions are subject to meaningful administrative review. See Manor Healthcare Corp. v. Lomelo, 929 F.2d 633, 638 (11th Cir.1991) (holding that a mayor was not a final policymaker with respect to zoning decisions where the city charter provided that the city counsel could override the mayor's veto of zoning ordinances); *Mandel*, 888 F.2d at 792-94 (recognizing that a municipal officer has final policymaking authority when his decisions "are not subject to review" and holding

10

that discretionary review initiated by the municipal official himself does not prevent the official from being a final policymaker); cf. *Hill v. Clifton*, 74 F.3d 1150, 1152 (11th Cir.1996) (accepting concession that city police chief was not final policymaker with respect to employment decisions where police chief's decisions could be reversed by the city manager); *Martinez v. City of Opa-Locka*, 971 F.2d 708, 713-15 (11th Cir.1992) (finding final policymaking authority where "the City Manager's decision to hire or fire administrative personnel is completely insulated from review").

Our *Manor Healthcare* decision is particularly illuminating. In Manor Healthcare, a nursing home corporation filed a § 1983 suit against the City of Sunrise, Florida. See 929 F.2d at 635. As the basis for its claim against the city, the plaintiff corporation contended that the mayor of Sunrise had extorted $30,000 from it in exchange for the mayor's cooperation in securing a special zoning exception for the nursing home. See Id. at 636-37. We held that wrongful acts committed by the mayor in his administration of the city's zoning department could not subject the city to § 1983 liability, even though the city charter gave the mayor "the power to oversee and administer all departments and agencies of the city, including the planning and fire departments." Id. at 637. That was not enough for municipal liability, because the charter also gave the city council the power to override the mayor's veto on zoning matters, and as a result "[the mayor] was not the ultimate policymaking authority regarding zoning issues in the City of Sunrise." *Id.* (citing *Praprotnik*).

As *Manor Healthcare* and our other post-Praprotnik cases make plain, the principles espoused by a plurality of the Supreme Court in *Praprotnik* have become embedded in the binding precedents of this circuit. Final policymaking authority over a particular subject area does not vest in an official whose decisions in the area are subject to meaningful administrative review.

Scala protests that the effect of this rule of law is to unfairly insulate municipalities from liability for the wrongful conduct of subordinate officials. That argument is problematic for at least two reasons. First, if *Praprotnik*'s final policymaker requirement, as embedded in our circuit law, creates an undesirable barrier to municipal liability, that is not a problem this panel can solve. We must take our circuit's law as we find it unless and until the Supreme Court, Congress, or this Court sitting en banc changes it. Second, we note that the rule of *Praprotnik* does not leave plaintiffs such as Scala without a remedy. One remedy is provided them by the very means of administrative review that serves to insulate municipalities from *respondeat superior* liability for the conduct of rogue subordinates. Another such remedy is an

11

individual-capacity civil action brought against the subordinate officials themselves. In this case, for strategic or other reasons, Scala chose not to pursue any legal remedy he had against Younger or Barrett. That Scala made the strategic choices he did is no reason for us to abandon our post-*Praprotnik* precedents.

### B. APPLICATION OF THE *MONELL* STANDARD TO THIS CASE

In this case, there is no question that the Civil Service Board had the authority to review the decision of Barrett and Younger to terminate Scala. In fact, Scala concedes that "[t]he Board had the power to review the City Manager's decision." That concession is hardly surprising, given that: (1) the governing city regulations provide for such review; (2) the Board did actually review the termination decision in this case; and (3) Scala had previously used the Board's review procedures to his benefit, when he convinced the Board to reverse his earlier demotion.

Despite the power vested in the Board to review termination decisions within the fire department, Scala contends that either Barrett or Younger, or both, should be considered final policymakers. He argues that Barrett and Younger are final policymakers, because their decisions are not automatically reviewed by the Board; an employee has to appeal to the Board before it will take any action to review decisions made by the appointing authorities. However, that is essentially the same argument that the *Praprotnik* plurality rejected, and that this Court rejected in Manor Healthcare. See Praprotnik, 485 U.S. at 130, 108 S.Ct. at 928 (explaining that "the mere failure to investigate the basis of a subordinate's discretionary decisions does not amount to a delegation of policymaking authority"); *Manor Healthcare*, 929 F.2d at 638 ("Manor cannot now contend that the city council would have deferred to [the mayor's] judgment on all zoning issues since Manor failed to trigger the city council's authority.").[3]

In contending that the absence of automatic administrative review transforms Barrett or Younger into final policymakers, Scala makes no effort to distinguish *Praprotnik* or *Manor Healthcare*. Instead, he relies on a pre-*Praprotnik*, pre-Pembaur case from this circuit, *Wilson v. Taylor*, 733 F.2d 1539 (11th Cir.1984). As Scala correctly points out, we held in *Wilson* that "even where an appellate process exists to review an official's decision, that official may be held to exercise final authority within the city." *Id*. at 1546. It is also true that in *Wilson*, we found it significant that "an appeal did not automatically follow" a police chief's termination decision. *Id*. The trouble with Scala's argument, however, is that Wilson is no longer good law, in light of *Pembaur, Praprotnik*, and their progeny in this circuit.[4]

12

In light of *Praprotnik* and this circuit's precedents applying the principle it announced, it is clear that Barrett and Younger do not become final policymakers for § 1983 purposes simply because persons who disagree with their decisions have to file an appeal in order to have those decisions reviewed. The City's governing documents provide employees with an opportunity for meaningful administrative review of termination decisions at the fire department, and there is no evidence that the Board merely rubber-stamps the decisions of the appointing authorities. In fact, Scala's own prior experience with the Board demonstrates to the contrary, because Scala was able to convince the Board to reverse the demotion he had received in an earlier disciplinary proceeding.

Because the City Civil Service Board has the power to reverse any termination decision made by Barrett or Younger, neither of them is a final policymaker with respect to termination decisions at the fire department. The Board reviewed Scala's termination. The result was an affirmance, but there is no evidence (and Scala does not even allege) that the Board's decision approved any improper motive that Barrett or Younger may have had. *See Hill v. Clifton*, 74 F.3d 1150, 1152 (11th Cir.1996) (affirming summary judgment for city in § 1983 employment case where plaintiff presented no evidence that the city's reviewing authority approved any improper motive underlying the plaintiff's demotion). Accordingly, the district court correctly granted summary judgment in favor of the City.[5]

---

### Footnotes

[2] Recently, the Supreme Court appeared to cast some doubt on its *Pembaur* decision by declining to address "[w]hether that decision was intended to govern only the situation at hand or to serve as a rule to be applied over time." *Board of County Comm'rs v. Brown*, --- U.S. ----, ----, 117 S.Ct. 1382, 1388, 137 L.Ed.2d 626 (1997). Nevertheless, the Court stopped far short of overruling *Pembaur* in *Brown*. Unless and until the Supreme Court overrules *Pembaur*, or Congress adjusts § 1983 municipal liability standards, the *Pembaur* decision remains binding on this Court. *See Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484, 109 S.Ct. 1917, 1921-22, 104 L.Ed.2d 526 (1989) (admonishing the courts of appeals to leave to the Supreme Court "the prerogative of overruling its own decisions").

[3] Even putting precedent aside, we are puzzled by the suggestion that administrative review of personnel decisions should occur without any initiative by the supposedly aggrieved party. The board can hardly be expected to conduct a plenary review of every personnel decision that Barrett and Younger make. Why should it expend time and resources reviewing decisions that no one is complaining about? Because Barrett and Younger are not likely to complain to the Board about their own decisions, common sense seems to dictate that aggrieved employees, like Scala, should initiate Board review if they wish to have it.

> [4] We note that another part of *Wilson* is at odds with the Supreme Court's subsequent decision in *Jett v. Dallas Independent School District*, 491 U.S. 701, 737, 109 S.Ct. 2702, 2724, 105 L.Ed.2d 598 (1989), which established that the final policymaker issue is a question of law for the trial judge. In *Wilson*, by contrast, we had held that the final policymaker issue was properly decided by the jury as a question of fact. *See* 733 F.2d at 1547. In light of subsequent Supreme Court decisions, little, if anything, of *Wilson's* final policymaker analysis survives.
>
> [5] Although the district court properly concluded that neither Barrett nor Younger are final policymakers with respect to termination decisions at the fire department, we disagree with the district court's assertion that even if Younger or Barrett possessed final decision-making authority with respect to Scala's termination, municipal liability could not attach "merely" for that reason. To the contrary, if Younger or Barrett had *final* (i.e., nonreviewable) decision-making authority with respect to termination decisions at the fire department, they would be final policymakers in that subject area, and thus could subject the City to liability if the decisions they made in that capacity were illegal ones. *See, e.g., Pembaur*, 475 U.S. at 483-84, 106 S.Ct. at 1299-1300. In this case, however, the availability of meaningful Board review prevents termination decisions made by Younger or Barrett from being "final" for § 1983 purposes, and that precludes the City from being held liable for those decisions.

116 F.2d 1399-1403.

## **What's Wrong with *Scala*?**

This court is not particularly enamored of *Scala*. There is no other way to read the case except as one that completely insulates cities from liability under § 1983, even if the municipality's mayor and council together have administered discipline clearly traceable to one or more proscribed, invidious motivations. If there is a review board with the power to take another look at the decision, the employee can forget suing the city under § 1983. Whether the review board agrees or disagrees with the discipline meted out makes no difference. Of course, the employee could undertake the Herculean task of suing the city <u>and</u> its review board, challenging the motivation of the board under *Pembaur* and

14

*Praprotnik* as the city's ultimate policymaker. But, having to prove that a quasi-judicial body had a proscribed motive for its deliberative decision does not sound like something that would induce a smart lawyer to jump to the ready. A personnel board does not make an inviting target for alleged constitutional torts. The net effect will be to eliminate § 1983 liability for municipalities, because those cities that don't have a personnel board will establish one. As a practical matter, it will be impossible to prove to a jury that a personnel board that affirms an adverse employment decision did not believe the initiating municipal official's always available, legitimate, articulated non-discriminatory reason for his decision, although the very same jury may have laughed at the articulated reason if expressed on the stand by the municipal official himself. The official's true intent, if he had it, namely, to retaliate in response to an employee's exercise of a clear First Amendment right, as in *Morro v. City of Birmingham*, 117 F.3d 508 (11th Cir. 1997), would come through much more clearly to a jury than any possible intent by the majority of a personnel board to do the same thing.

Another problem this court finds with *Scala* is the absence of any power in any personnel board, at least in the State of Alabama, to award to the victim of a constitutional tort compensatory damages for his mental anguish. Clearly, such damages are available under § 1983. This raises the question of whether personnel board review is truly "meaningful" substantively.

15

Ostensibly, courts of this circuit must consider the employee's humiliation to be of no consequence if he has a personnel board remedy.

Of course, *Scala* involved a city-affiliated personnel board, just as the Personnel Board in the instant case is affiliated with and appointed by the City of Talladega. An interesting feature in both *Scala* and *Vincent* therefore, is that the review board is appointed by municipal officials who, without such a board, would either <u>be</u> or would create *Pembaur* targets. This court, when he was a lawyer back in the dark ages, succeeded in getting the Supreme Court of the United States in *Glover v. St. Louis-San Francisco Railway Co.*, 393 U.S. 234, 89 S. Ct. 548 (1969), to hold unanimously, consistent with its prior decisions:

> The circumstances of the present case call into play another of the most obvious exceptions to the exhaustion requirement--the situation where the effort to proceed formally with contractual or administrative remedies would be wholly futile. In a line of cases beginning with Steele v. Louisville & Nashville R. Co., supra, <u>the Court has rejected the contention that employees alleging racial discrimination should be required to submit their controversy to "a group which is in large part chosen by the [defendants] against whom their real complaint is made</u>."

*Id.* at p. 551. The City of Winter Park appointed the personnel board in *Scala*. The personnel board in the instant case is appointed by the City of Talladega. Not only does this fact raise the *Glover* specter, but *Scala* itself requires a "meaningful administrative review" in order to provide effective municipal insulation. Is a "meaningful administrative review" the functional equivalent of "due process"? This court can find no binding

16

appellate answer to this question.

The flip-side of the "due process" problem inherent in viewing a <u>city-appointed and affiliated</u> personnel review board as the city's real decisionmaker appears in *Morro v. City of Birmingham*, *supra*, where in *dictum* the Eleventh Circuit expanded the *Scala* concept to include the right to appeal to a <u>separate and independent personnel board, not appointed by the city</u>, but which reviews disciplinary decisions both for its county and for all the municipalities in it. If the *Morro* dictum becomes the law of the Eleventh Circuit, all municipalities in Jefferson County, Alabama, will become immune from § 1983 liability by virtue of the single fact that their potentially constitutionally abused employees can appeal to the Jefferson County Personnel Board. The Eleventh Circuit further complicated the dictum in *Morro* by pointing out that the decision of the Personnel Board of Jefferson County is reviewable by a state trial court, which, therefore, may be the final decisionmaker for municipalities in Jefferson County instead of the Personnel Board. This court has a difficult time understanding how an entirely separate and independent tribunal can be the final decisionmaker for a municipality for the purposes of the *Pembaur-Praprotnik* analysis.

The last problem this court finds with *Scala* is that *Scala* cannot apply to <u>hiring</u> decisions because such decisions are not reviewable by a personnel board. This creates an anomaly where a municipality is <u>not</u> liable for its mayor's invidiously

17

discriminatory decision to <u>fire</u> a female because of her gender (she has an appeal to the personnel board), but it is liable for <u>refusing to hire</u> the same female for the same reason (she has no appeal to the personnel board).

Despite the criticisms this court makes of *Scala*, *Scala* is the law of the Eleventh Circuit. It binds this court. Because *Scala* has pulled the rug out from under Vincent, a rug that was slipping from under him even before *Scala*, defendants' motion for summary judgment will be granted, and plaintiff's counter-motion will be denied.

DONE this 23rd day of September, 1997.

_____
WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE